## COMMONWEALTH v. SAMUEL W. BELL.

PETITIONS OF JOHN R. TATE, THOMAS J. DOWNING AND EDWIN SHAFFER, FOR WRITS OF HABEAS CORPUS.

Argued January 12, 1891—Decided October 5, 1891.

[To be reported.]

1. When a petition for a writ of habeas corpus sets forth that the relator is in custody by virtue of an order of the court adjudging him guilty of contempt and sentencing him to imprisonment, for refusing to testify as a witness in a criminal case, the fact that the sheriff's return to the writ does not set out the contempt, or state facts showing the jurisdiction of the court to commit the relator, is immaterial.

2. When a witness has been sentenced to imprisonment for contempt of

court in refusing to testify for the commonwealth upon the trial of an indictment, the sufficiency of such indictment, whether it was properly framed, or whether the acts charged therein constitute an indictable offence, cannot be considered upon a petition of the recusant witness for a writ of habeas corpus.

3. A witness who declines to answer a question, upon the ground that it would tend to criminate himself, is not the final arbiter of the question whether the interrogatory propounded to him has such a tendency.   The decision of this question is committed by § 10, act of May 23, 1887, P. L. 161, to the trial judge, who therefore necessarily has the power to enforce his decision by punishing a refusal to obey it.

4. Upon the trial of an indictment for bribery, a witness for the commonwealth was asked, in substance, whether the defendant on trial had at a certain time offered a bribe to the witness.   A responsive answer to the question, without more, would not tend to criminate the witness, in such a sense as to justify a refusal on his part to answer it: Per Mr. Justice STERRETT.

5. The provision in § 32, article III. of the constitution, that a witness shall not be permitted to withhold his testimony against persons charged with " the offence of bribery, or corrupt solicitation," but that such testimony shall not afterwards be used against him in any proceeding, etc., does not relate solely to the " bribery " and " corrupt solicitation " specified in §§ 29 to 31 of the same article.

6. The words " offence of bribery," employed in § 32, mean all bribery, whether at common law, under the constitution itself, or under any statute ; and include bribery at nominating conventions or delegate elections, made criminal by act of June 8, 1881, P. L. 70.   The words of the constitution should be taken in their popular, natural and ordinary meaning, and little significance attached to the wording of the captions.

7. When a witness has claimed the privilege of refusing to testify on the ground that his testimony would tend to criminate himself, and the court has required him to do so, deciding that the case is within § 32, article III. of the constitution, and the witness is protected thereby, such decision, whether right or wrong, will shield the witness from having testimony, given in such circumstances, afterwards used against him.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLAMS, McCOLLUM and MITCHELL, JJ.

Nos. 37, 36, 38 October Term 1891, Sup. Ct.; court below, No. 8 September Term 1890, Q. S.

## NO. 37.

On December 22, 1890, John R. Tate caused to be presented to Mr. Justice CLARK at Chambers, a petition for a writ of habeas corpus directed to Samuel W. Bell, sheriff of Lawrence county.   The petition made the following averments:

Statement of Facts.

" That on the fifteenth day of December, 1890, at No. 8 September Sessions of the Court of Quarter Sessions of Lawrence county, there was pending and undetermined an indictment against one William D. Wallace, wherein it was charged:

" 1. That the said William D. Wallace did, on the third day of July, 1890, unlawfully and corruptly promise and agree to give to the said John R. Tate and others, electors and delegates to a nominating convention, convened for the nomination of a candidate for congress in the twenty-fifth congressional district, certain gifts or rewards, to wit, a large sum of money, to wit, $1,200, in consideration that the said John R. Tate and others, electors and delegates aforesaid, would give and cast their votes in said convention for the nomination of Alexander McDowell, as a candidate for the office of congressman aforesaid ; the said Alexander McDowell being a candidate for said nomination.

" 2. That said William D. Wallace did, on the same day, unlawfully and corruptly solicit, encourage and request the said John R. Tate and others to receive and accept said sum of money as a bribe and pecuniary reward to induce and influence them to make and join in the nomination of said Alexander McDowell as a candidate for said office.

" That on the same fifteenth day of December, 1890, at No. 11 September Session of said court, there was pending and undetermined an indictment charging:

" 1. That your petitioner, John R. Tate, elector and delegate in the convention aforesaid, did on the third day of July, 1890, unlawfully, wickedly and corruptly accept and receive from said William D. Wallace, and divers other persons unknown, friends of Alexander McDowell, a candidate as aforesaid, a certain gift or reward in money, to wit, the sum of $650, under an agreement and promise that he, the said John R. Tate, elector and delegate as aforesaid, in said convention would give his vote for the nomination of said Alexander McDowell as the candidate aforesaid; and that John R. Tate did on the same day unlawfully, wickedly and corruptly accept and receive the promise of said William D. Wallace and other persons unknown, friends of said Alexander McDowell, that he, the said John R. Tate should thereafter receive a certain gift or reward in money, to wit, the sum of $650, if he, the said John R. Tate, would give his vote in said nominating convention for the nomination of said Alexander McDowell.

" And 2. That said John R. Tate, afterwards on the same day, in pursuance of said unlawful, wicked and corrupt agreement and promise, did give his vote for the nomination of said Alexander McDowell, and did thereupon unlawfully, wickedly and corruptly accept and receive from said William D. Wallace and others unknown, said gift or reward in money, to wit, the sum of $650.

" And 3. That on the same day said John R. Tate did unlawfully, wickedly and corruptly offer and agree with the said William D. Wallace and others unknown, friends of said Alexander McDowell, to give his vote at said nominating convention to said Alexander McDowell, in consideration that for his said vote for said Alexander McDowell, he, the said John R. Tate, should receive a gift or reward in money, to wit, the sum of $650.

" And 4. That on the same day, said John R. Tate, a delegate elected from Beaver county, and acting as a delegate in said convention, unlawfully, wickedly and corruptly did solicit, accept and receive from said William D. Wallace and others unknown, a certain bribe in money, to wit, the sum of $650, to induce and influence him, the said John R. Tate, to make and join in the nomination for said office of said Alexander McDowell.

" And 5. That on the same day, the said John R. Tate, acting as a delegate in said convention, did unlawfully, wickedly and corruptly solicit, accept and receive from said William D. Wallace and others unknown, a certain bribe in money, to wit, the sum of $650, to induce and influence him, the said John R. Tate, then and there to make and join in the nomination for said office of said Alexander McDowell.

" That on the said December 15, 1890, the said William D. Wallace being on trial before the honorable A. L. Hazen, president judge, and his associates and a jury, in the county of Lawrence aforesaid, upon the indictment first above mentioned, your petitioner, John R. Tate, was called as a witness in behalf of the commonwealth against said William D. Wallace, and being duly sworn was inquired of by the acting district attorney as follows :

" Q. State, Mr. Tate, whether you ever heard the defendant in this case, Mr. Wallace, talk about drawing a check at any time during the nominating convention held in this city ?

" Q. State whether you ever heard him make any offers or promises of money to Thomas J. Downing and Edwin Shaffer, in connection with any other person, in case they would vote for Major McDowell?

" Q. Did you have any conversation with William D. Wallace about how you should vote that day?

" Q. State whether Mr. Wallace had any packages of envelopes there that day with money in them.

" Q. State whether Mr. Wallace offered any money to Thomas J. Downing and Edwin Shaffer, in connection with any other parties?

" Q. Was he soliciting you to vote for Major McDowell at the times you were in his office?

" Q. At the times you were in his office, on the last day of the convention, did he offer you, Downing, or Shaffer, any money as an inducement in case you would vote for Major McDowell, and, if so, how much?

" Q. Didn't you, when you were asked in the grand jury at the last term of court, whether Mr. Wallace had offered you $1,200, yourself, Tate, Shaffer and Downing, the last day of the convention, and didn't you answer that question and say he had?

" Q. Mr. Tate, state whether you ever heard Mr. Wallace talk about drawing a check at any time during the last nominating convention?

" Q. State whether you know or heard of Mr. Wallace offering to anybody any money there in his office that day?

" Q. State whether or not Mr. Wallace said anything about drawing a check for any persons, in case they would vote for Major McDowell, and if so, how much, and to whom?

" Q. Was he soliciting you to vote for Major McDowell at the times you were in there in his office?

" Q. State, Mr. Tate, whether Mr. Wallace, at the time you were in there on the last day of the convention, offered you, Downing, or Shaffer, any money in case you would vote for Major McDowell, and if so, how much, as an inducement to influence you to vote for Major McDowell?

" Q. Going back to the time that you and Mr. Downing and Mr. Shaffer met Mr. Wallace coming up street, state whether you went into a side street together?

" Q. You have stated you were in the office of Mr. Wallace the final day of the convention ; was there anything said to you by Mr. Wallace that day as to your vote for Major McDowell?

" Q. Did Mr. Wallace say anything to you about voting for Major McDowell on the third ballot that afternoon?

" Q. State, Mr. Tate, whether Mr. Wallace offered you, Thomas Downing, and Edwin Shaffer, $1,200 in case you would vote for Major McDowell that afternoon on the third ballot?

" Q. Did he say anything to you about voting for Major McDowell that afternoon?

" To which several questions your petitioner declined to make answer, stating to the court as the reason for his refusal to answer, that his answers would tend to criminate him, and that he had been so advised by his counsel.   Whereupon, the president judge required and directed said John R. Tate, your petitioner, to answer said several questions, stating to him that his answer could not be used against him in any criminal proceeding against him.   But your petitioner still refusing to answer, for the same reason above stated, and also under the advice of his counsel, the court, on December 16, 1890, adjudged him guilty of contempt and committed him to the common jail in custody of the sheriff, until such time as he would purge himself of the contempt.

" Your petitioner was imprisoned in the common jail in the custody of the sheriff until December 17, 1890, when he was, by the direction of the court, brought into court, and being inquired of by the president judge, whether he still persisted in his refusal to answer the several questions aforesaid, answered that he did, for the same reasons before stated, whereupon he was remanded to said jail.   And, in the afternoon of the same day, being again by the direction of the court brought into court, he, through his counsel, stated to the court that he in refusing to answer the questions asked him on the part of the Commonwealth in the case of Commonwealth v. William D. Wallace, at No. 8 September Sessions 1890, and for which refusal he had been convicted of contempt by said court, had in such refusal no purpose or intention of contumacy or of interfering with or preventing the course of justice ; on the contrary, he said that he was indicted in the same court, at No. 11 September Sessons 1890, for the alleged offence of receiving bribes, offering

Statement of Facts.

to accept and receive bribes from William D. Wallace to give his vote, while a delegate to the same nominating convention charged in the indictment against Wallace, and employed counsel to conduct his defence in said case; that his counsel aforesaid had advised and counseled him and he verily believed that an answer to the said questions would tend to criminate him and could be used as evidence against him on the trial of the case against him; and further, he was so advised and verily believed that the course pursued by him as aforesaid was the only means by which he could protect his legal rights in the conduct of his own defence. He further showed to the court, that with all due respect to his Honor's judgment, he was still advised by his counsel, that in their opinion the said adjudication was erroneous, and that he intended to remove the case to the Supreme Court, in order that the said judgment might be reviewed therein; and further, he said that if the Supreme Court should hold and decide that he ought to answer said questions, and his answers would not tend to criminate him, and could not thereafter be used against him, that he would then be willing to answer them. The court thereupon sentenced your petitioner as follows:

" 'And, now, December 17, 1890, the witnesses, Edwin Shaffer, alias Edward Shaffer, Thomas J. Downing and John R. Tate, are each sentenced to pay a fine of two hundred dollars to the commonwealth, and each to undergo an imprisonment in the common jail in and for the county of Lawrence, until the tenth day of March next; and stand committed to the custody of the sheriff for the purpose of carrying this sentence into effect.'

" By virtue of which, your petitioner is now in the said common jail, in custody of Samuel W. Bell, sheriff.

" Your petitioner therefore avers, that he is unjustly restrained of his liberty and confined in the said common jail of the said county of Lawrence, in the custody of the said Samuel W. Bell, high sheriff of said county, as appears by the warrant of commitment, a copy of which is hereunto attached.

" And therefore prays your Honor to grant a writ of habeas corpus directed to Samuel W. Bell, sheriff, to bring before your Honor your petitioner's body to do, submit to, receive and abide by whatsoever your Honor shall consider in that behalf."

Statement of Facts.

Upon the presentation of the foregoing petition, Mr. Justice CLARK made an order awarding a writ of habeas corpus, returnable forthwith at chambers at Indiana. The writ having been issued and served, the sheriff of Lawrence county, on December 23, 1890, made return thereto that he held the relator in custody by virtue of a certified record of a commitment of which the following was a copy :

" Commonwealth        In the Court of Quarter Sessions
          v.                of Lawrence county, Pennsylvania.
" W. D. Wallace.    No. 8 September Sessions 1890.

" And now, December 17, 1890, the witnesses Edwin Shaffer, alias Edward Shaffer, Thomas J. Downing and John R. Tate, are each sentenced to pay a fine of two hundred dollars to the commonwealth, and each to undergo an imprisonment in the common jail in and for the county of Lawrence, until the tenth day of March next; and stand committed to the custody of the sheriff for the purpose of carrying into effect this sentence.                    BY THE COURT."

Thereupon, the following order was made, Mr. Justice CLARK :

" And now, December 23, 1890, this writ of habeas corpus having been served, and return thereto made by the sheriff of Lawrence county in due form, the further hearing is continued to the second Monday in January next, at 11 o'clock A M., before the court in banc in the Eastern District, the proceedings to be duly certified by the prothonotary to the Eastern District, to that end ; the relator, upon his first entering bail with approved sureties in the sum of $2,500, conditioned for his appearance in the Supreme Court of Pennsylvania on the day and hour aforesaid and that he remain and not depart without leave, but will abide the order of the court in the premises, to be discharged from custody ; otherwise the relator to be remanded to the custody of said sheriff. Bail having been entered with sureties as required, the relator is discharged from custody."

NOS. 36, 38.

With the petition of John R. Tate, similiar petitions were presented to Mr. Justice CLARK on behalf of Thomas J. Downing and Edwin Shaffer respectively, these petitioners having been committed by the Court of Quarter Sessions of Lawrence

Arguments.

county, at the same time with Tate, for contempt in refusing to answer questions put to them as witnesses upon the trial of William D. Wallace, which were in the main the same in substance as the questions set out in Tate's petition, though Downing and Shaffer were asked, in addition, whether they had received anything from Wallace in consideration of voting for Major McDowell. The facts with reference to their refusal to testify in answer to these questions, and the action of the Court of Quarter Sessions thereon, were similar to the facts in the case of Tate. Upon these petitions, similar orders were made by Mr. Justice CLARK, and similar returns were made to the writs of habeas corpus by the sheriff.

*Mr. B. A. Winternitz and Mr. J. Norman Martin* (with them *Mr. J. G. McConahy* and *Mr. M. McConnell*), for the relators :

1. The court below erroneously construed § 32, article III. of the constitution, as though it stood alone, giving a signification never intended. In our view, §§ 29 to 32 are to be read together, and thus read their meaning is plain, clear, and easily understood. The mischief intended to be remedied was legislative bribery. If § 32 includes everything that the legislature may make bribery, or that was bribery at common law, or even everything that is called bribery in any part of the constitution, the words in § 29, " within the meaning of this constitution," would be surplusage, and the disqualifying clause of § 9, article VIII. would be useless and unnecessary. The "offence" referred to in § 32, article III., refers to the offences named in § 31. In support of this view, see : 2 Conv. Deb. 488, 490, 491, 499 ; 5 Idem, 312, 313 ; 7 Idem, 412, 434, 435 ; Buckalew on Const., 96, 98. This is in accordance with the general rules of construction : Dwarris on Stat., 704, et seq.; Cooley on Const. Lim., 59, n. 2.

2. Neither of the counts in the indictment against Wallace charged the offence referred to in the constitution, nor indeed any offence, either at common law or under any statute. The witnesses, then, had a legal right to refuse to answer any questions that might tend to criminate them, or elicit a fact which would become a link in the chain of circumstantial evidence : 1 Greenl. Ev., § 451 ; 1 Whart. Cr. L., § 805 ; 1 Russ. on

Arguments.

Crimes, § 538; Ex parte Doran, 2 Pars. 467; Baird v. Cochran, 4 S. & R. 397; McFadden v. Reynolds, 20 W. N. 312; § 9, article I. of the constitution. The true interpretation of the constitutional provision, just cited, is that a person cannot be compelled to give testimony against himself before any tribunal, in any proceeding, tending to criminate himself in that or in any other proceeding: Cullen v. Commonwealth, 24 Gratt. 624; McFadden v. Reynolds, 20 W. N. 312; Horstman v. Kaufman, 97 Pa. 147.

3. Having merely asserted their constitutional right and common-law privilege, the witnesses were not guilty of contempt: People v. Kelley, 24 N. Y. 74; Ex parte Rowe, 7 Cal. 175. Whether the answer to any single question would or would not have tended to criminate the witnesses, or furnish a link in the chain of criminating evidence, is not before this court. The lower court did not rule upon each question as asked, and the witnesses were adjudged guilty of contempt for refusing to answer all the questions. And this court has jurisdiction on habeas corpus to inquire whether the court below exercised its summary power in a case where it was not warranted by law: Commonwealth v. Ketner, 92 Pa. 372; Commonwealth v. Perkins, 124 Pa. 36; Hummell & Bishoff, 9 W. 416; Commonwealth v. Newton, 1 Gr. 453; People v. Kelley, 24 N. Y. 74; Ex parte Rowe, 7 Cal. 175; § 1, act of June 16, 1836, P. L. 785. Moreover, the commitment does not show any contempt, or set out any facts showing that the court had jurisdiction to commit the relators.

*Mr. James A. Gardner,* Special District Attorney (with him *Mr. D. B. Kurtz, Mr. J. M. Martin* and *Mr. A. P. Marshall*), for the respondent:

1. The relators were convicted of contempt by a competent court, and the propriety of their conviction cannot be reviewed on habeas corpus: 3 Am. & Eng. Encyc. of Law, 790, 800; 9 Idem, 164, 214, 215; Williamson's Case, 26 Pa. 9; Ex parte Kearney, 7 Wheat. 38; 2 Bish. Cr. L., § 254; Clark v. People, Breese (Ill.) 340 (12 Am. Dec. 177); Crosby's Case, 3 Wils. 188; Ex parte Shaw, 7 Ohio St. 81 (70 Am. Dec. 55); Platt v. Harrison, 6 Ia. 79 (71 Am. Dec. 389); Commonwealth v. Lecky, 1 W. 66; Ex parte Yarbrough, 110 U. S. 651; Byers

Arguments.

v. Commonwealth, 42 Pa. 90; Ex parte Virginia, 100 U. S. 339; Commonwealth v. Phila. Co., 26 Pa. 279; Commonwealth v. Deacon, 8 S. & R. 72; Bell v. State, 4 Gill. 301 (45 Am. Dec. 130); Ex parte Adams, 25 Miss. 883 (59 Am. Dec. 234); Ex parte Grace, 12 Ia. 208 (79 Am. Dec. 529).

2. We do not dispute the proposition that a witness cannot be compelled to give criminating testimony against himself, but it is subject to this limitation, that if the constitution, or a statute, provides that such testimony shall not be used against him in any judicial proceeding, he is thus fully protected and can be compelled to testify: People v. Kelley, 1 Am. L. Reg., N. S., 534. We also believe that none of the questions asked Tate had any tendency to criminate him, and but one question put to Downing, and only three of those asked Shaffer, had such a tendency. If any one question should have been answered, the judgment of the court should not be disturbed: Henwood v. Commonwealth, 52 Pa. 427; Election Cases, 65 Pa. 39; and it was for the court to determine whether the questions had a criminating tendency: Ward v. State, 2 Mo. 120 (22 Am. Dec. 449); Whart. Cr. L., § 807; Burr's Trial, 424; Fries v. Brugler, 7 Hals. 79 (21 Am. Dec. 56); Sidebottom v. Adkins, 3 Jur. 63; Adams v. Lloyd, 3 Hurl. & N. 351; Whart. Cr. Ev., §§ 465, 469. And where the witness is compelled to answer, the testimony cannot be used against him: Rex v. Garbett, 1 Den. C. C. 236; Whart. Cr. Ev., § 465.

3. Even if all the questions put had a criminating tendency, the court was right in holding that § 32, article III. of the constitution protected the witnesses. The charge against Wallace was bribery at common law, and came within the spirit of the act of June 8, 1881, P. L. 70; Respublica v. Teischer, 1 Dall. 335; Commonwealth v. Taylor, 5 Binn. 280; Campbell v. Commonwealth, 59 Pa. 267; 1 Whart. Cr. L. 179; Commonwealth v. McHale, 97 Pa. 408; Commonwealth v. Walter, 83 Pa. 107; 3 Greenl. Ev., § 71; State v. Ellis, 33 N. J. L. 102 (97 Am. Dec. 707); Commonwealth v. Mohn, 52 Pa. 246; Leonard v. Commonwealth, 112 Pa. 607; Rex v. Plympton, 2 Ld. Raym. 1377; Commonwealth v. Shaver, 3 W. & S. 343; 2 Bish. Cr. L., §§ 96, 98; Rex v. Pitt, 3 Burr. 1335; Archb. Cr. Pl. & Pr., 570, 574–577; United States v. Worrall, 2 Dall.

384.   The words used in § 32, article III. of the constitution, should be construed according to their plain and literal meaning, without restricting them to any special classes of bribery, etc.: 2 Am. & Eng. Encyc. of Law, 679; Moers v. Reading, 21 Pa. 188; Leonard v. Commonwealth, 112 Pa. 624; Houseman v. Commonwealth, 100 Pa. 231; Commonwealth v. Randall, 2 W. N. 210; Commonwealth v. Walter, 83 Pa 107.

NO. 37 : COMMONWEALTH, EX REL. TATE.

OPINION, MR. JUSTICE STERRETT:

In December, 1890, William D. Wallace was on trial in the Court of Quarter Sessions of Lawrence county on an indictment charging him, in the second count, with offering John R. Tate, Edwin Shaffer, and Thomas J. Downing, electors and delegates to a nominating convention, money as a bribe ; and, in the third count, with soliciting, encouraging, and requesting said John R. Tate, Edwin Shaffer, and Thomas J. Downing, delegates to a nominating convention, to receive and accept money as a bribe, to influence them to make and join in nominating a candidate for congress.   The relator, being called and sworn as a witness on behalf of the commonwealth, was asked certain questions, which he refused to answer, on the ground that his answers would tend to criminate him.   Other questions were repeatedly propounded to the witness, and, for the same reason, he refused to answer either of them.   The question of privilege claimed by him was then discussed, and, after due consideration, the decision of the court was announced to the witness as follows:  " The question has been argued in regard to the privilege which you claim, and the court has announced its decision that the witness must answer the questions asked, but that the answers cannot be used against you in any criminal proceeding."   The witness having still declined to answer any of the questions propounded to him, the president of the court, addressing him, said :  " Are you aware of the fact, Mr. Tate, that your refusal to answer is contempt of court, for which you may be punished by imprisonment ? "   To which he replied in the affirmative.   Thereupon the court, after referring to the facts, adjudged the relator guilty of contempt, and committed him " until such time as he will purge himself of said contempt."   On the following day,

Opinions of the Court.

the case of Commonwealth v. Wallace being still on trial, the relator was brought into court, and being asked if he was then willing to answer the questions which had been propounded to him the day before, replied : " I still claim my privilege," and refused to testify. The court, having considered the premises, thereupon, December 17, 1890, sentenced him " to pay a fine of two hundred dollars, and undergo an imprisonment in the county jail, . . . . until the tenth day of March next; and stand committed," etc. Afterwards, on December 23, 1890, the relator was brought before our Brother CLARK on this writ of habeas corpus issued by him at chambers, etc., and by his order the hearing was continued to January 12, 1891, before the court in banc, and an order admitting him to bail, etc., was made. As ancillary to this writ of habeas corpus, the record of the criminal case in which the relator refused to testify was brought before us and referred to, so far as it has any bearing upon the action of the Court of Quarter Sessions in adjudging him guilty of contempt of court, etc.

It is unnecessary to consider any technical objection to the sufficiency of the sheriff's return to the writ of habeas corpus, because, in his petition for the writ, the relator sets forth, inter alia, the fact that he was adjudged guilty of contempt of court in refusing to testify as a witness in the case above referred to ; that for said offence he was sentenced by the court to pay a fine of two hundred dollars, and undergo an imprisonment in the common jail of Lawrence county until the tenth day of March, 1891, " and stand committed to the custody of the sheriff for the purpose of carrying this sentence into effect; by virtue of which your petitioner is now in the said common jail in custody of Samuel W. Bell, sheriff." Nor is it necessary for us to consider the sufficiency of the indictment which Wallace was called upon to answer, whether it was properly framed, or whether the acts charged therein constitute an indictable offence, either at common law or by statute. These and all other matters pertaining to it were for the court before whom the cause was being tried, to consider and determine in the first instance. When they come properly before us (if they ever do), after that court has finally passed upon them, it will be time enough for us to consider them; but we may remark, in passing, that, if the acts therein charged are not

criminal, no time should be lost in making such acts highly penal. Delegate elections and nominating conventions are a necessary part of our representative and elective system, and as such they are recognized, and to some extent guarded and regulated, by law. Bribery and corruption in those sources of political and civil power are calculated, in a very high degree, to debauch and demoralize the people and undermine our institutions. Delegates to nominating conventions are the chosen representatives of the political party to which they profess to belong. In representing those by whom they are chosen, such delegates are called upon to discharge the most important duties that pertain to the elective franchise, the selection of proper persons as candidates for offices to be filled by the votes of the people. In many cases, a nomination is equivalent to an election. Bribery of delegates to nominating conventions is a contemptibly mean fraud upon our elective system, and, as was well said by the present Chief Justice in Commonwealth v. Walter, 83 Pa. 107, "a fraud upon the ballot is a crime against the nation."

The relator appears to have been conscious that there was something criminal in the acts laid in the indictment, which, as a witness for the commonwealth, he was called to sustain; because, in refusing to answer any question that could have had even a remote bearing on those acts, and many that had none whatever, he assigned as his only reason for such refusal that his answer would tend to criminate himself. Assuming that he honestly believed in the reason thus assigned, he would appear to be more susceptible of crimination than the trial court supposed he was; for, certainly, fully responsive answers to many of the questions that were put to him by the attorney for the commonwealth could not have had the slightest tendency to criminate him. Whether such answers might tend to criminate the defendant on trial was a matter that concerned only the parties to that case. In a legal point of view, at least, it could not concern the relator. After the relator's claim of privilege had been considered, and the court had informed him that he must answer the questions asked, but that his answers could not be used against him in any criminal proceeding, and he still, for the same reason as before, repeatedly refused to answer, what remained to be done? Was his determination in

opposition to the judgment of the court to be accepted as a finality, and was the court powerless to enforce its order in the premises? We think not. If it was, courts of justice would be at the mercy of contumacious witnesses. It would be in the power of the latter at any time to cause a miscarriage of justice. The relator was not the final arbiter of the question whether his answers to the interrogatories propounded would tend to criminate him. It was the plain duty of the trial judge to decide that question. Men who are as conscious of extreme susceptibility of crimination as the relator appears to have been, would be badly qualified to decide such questions, especially in their own cases.

The tenth section of our act of May 23, 1887, P. L. 161, provides that "any competent witness," except defendants actually upon trial in the criminal court, "may be compelled to testify in any proceeding, civil or criminal; but he may not be compelled to answer any questions which, in the opinion of the trial judge, would tend to criminate him." The trial judge, and not the witness, is therefore the proper person to decide such questions; and it requires no argument to show that, if it is his exclusive province to decide, he must necessarily have the power to enforce his decision by punishing the contumacious witness for refusing to obey.

It is quite apparent from an examination of the questions which the relator refused to answer that he was contumacious. The following are some of the questions which the relator refused to answer:

"State whether you ever heard Mr. Wallace talk about drawing a check at any time during the convention.

"State whether you heard him (Mr. Wallace) make any offers or promises of money to Thomas J. Downing or Edwin Shaffer, in connection with any other person, in case they would vote for Major McDowell.

"Did you have any conversation with William D. Wallace about how you should vote that day?

"State whether Mr. Wallace had any envelopes there that day, with packages of money in them.

"State whether Mr. Wallace, at the time you were in his office on the last day of the convention, offered you, Thomas J. Downing, and Edwin Shaffer, any money in case you would

vote for Major McDowell, and, if so, how much, as an induce-
ment to influence you to vote for Major McDowell?"

It is difficult to see how responsive answers to these questions,
without more, could have tended to criminate the relator.
Suppose, in answer to the last question, relator had said, "Yes,
he did. At the time and place mentioned, he offered each of
us five hundred dollars in case we would vote for Major Mc-
Dowell, and the offer was made as an inducement to thus vote."
That answer might tend to criminate the defendant then on
trial, but certainly it would not tend to criminate the witness,
to whom, with others, the offer was made. It requires some-
thing more than the naked fact that the offer was made and
the purpose for which it was made. If he had answered the
question affirmatively, as above supposed, and had then been
asked whether he accepted the offer, the question might or
might not, according to circumstances, involve a self-criminating
answer. But the question that was put to the witness did not
necessarily involve a criminating answer. The action of the re-
lator and other witnesses, in refusing to answer questions which,
apparently at least, did not involve self-criminating answers,
has more the appearance of concerted action on their part, where-
in they mutually agreed to refuse to testify to anything that
would tend to sustain the charges laid in the indictment against
the defendant on trial. These were all matters for the consid-
eration of the trial court; and, except for extraordinary rea-
sons which do not appear in this case, its judgment must be
regarded as final and conclusive.

But it is claimed that, in adjudging the relator guilty of con-
tempt of court, and sentencing him therefor, the court below
proceeded upon the erroneous assumption that his case was
within the purview of § 32, article III. of the constitution, which
ordains as follows:

"Any person may be compelled to testify in any lawful in-
vestigation or judicial proceeding against any person who may
be charged with having committed the offence of bribery, or
corrupt solicitation, and shall not be permitted to withhold his
testimony upon the ground that it may criminate himself, or
subject him to public infamy; but such testimony shall not
afterwards be used against him in any judicial proceeding, ex-
cept for perjury in giving such testimony," etc.

The relator's contention is that this provision relates solely to the crime of " bribery " and the offence of " corrupt solicitation," etc., specified in the twenty-ninth, thirtieth and thirty-first sections of the same article, and is necessarily restricted thereby. This, we think, would be a too narrow construction of our organic law. In construing a constitution it must be borne in mind that its provisions are necessarily general, and couched in the language of the people by whom it was ordained. Its words should therefore be taken in their popular, natural, and ordinary meaning, rather than in any technical or restricted sense. The object of construction, as applied to such an instrument, is to give full effect to the intent of its framers, and the people in adopting it. That intent, of course, is to be sought for in the instrument itself. If the words convey a definite meaning, involving no absurdity or conflict with other portions of the instrument, that meaning which is apparent on its face must be adopted: 3 Am. & Eng. Encyc. of Law, 679, and cases there cited. Little, if any, significance can be attached to the wording of the captions and titles of the several articles of such an instrument. At most they are merely intended to indicate the general character of the articles to which they are prefixed. That they were intended as critical and precise definitions of the subject matter of the articles, or as exercising restraining limitations upon the clear expressions therein contained, cannot be assumed: Houseman v. Commonwealth, 100 Pa. 222. This will be apparent by reference to several articles of our constitution. For example, article XII., " Public Officers," § 1 of which relates to elections, etc.; § 2, to incompatibility of offices ; and § 3, to duelling, etc., as a disqualification. It must be very apparent that the many different subjects to which its provisions relate are much more numerous than the eighteen articles and schedule which constitute the instrument. " To impose a limitation upon words of comprehensive import, some express declaration to that effect, or inevitable inference, would be requisite. Especially is this so in construing the organic law of the state. Such instruments deal with larger topics, and are couched in broader phrase, than are legislative acts: " Houseman v. Commonwealth, supra.

The word " bribery " appears to be first used in § 7, article II., wherein it is declared that " no person hereafter convicted of

embezzlement of public moneys, bribery, perjury, or any other infamous crime, shall be eligible to the general assembly, or capable of holding any office of trust or profit in this commonwealth." These words, "bribery, perjury," etc., were doubtless used in their plain and ordinary meaning, and without restriction, embracing both common-law and statutory offences coming within the same designation. In § 9, article VIII., the word "bribery" is again used without restriction, but in a connection which shows its relation to our election laws. The "bribery" therein mentioned is complete by offers, promises, etc., as was held in Leonard v. Commonwealth, 112 Pa. 607. The word "bribery" again occurs in § 29, article III., which, after defining what may be termed "legislative bribery," declares that the offender "shall be held guilty of bribery within the meaning of this constitution, and shall incur the disabilities provided thereby for said offence, and such additional punishment as is or shall be provided by law." Section 30 of the same article declares that any person who shall, directly or indirectly, do certain things, "shall be guilty of bribery," etc. By these sections, 29 and 30, which are legislative in their character, it was doubtless intended that the kinds of bribery therein defined should be taken out of the hands of the general assembly, so that they could not be changed by statutory enactment. Having thus given these provisions the force of organic law, the thirty-second section, now under consideration, makes provision for securing testimony, "in any lawful investigation or judicial proceeding against any person who may be charged with the offence of bribery," etc., by declaring that "any person may be compelled to testify," etc. We think the words "offence of bribery," employed in the thirty-second section, mean *all bribery*, whether bribery at common law, or under the constitution itself, or any kind of statutory bribery. The learned court was therefore right in saying to the relator that he must testify, and that his testimony could not afterwards be used against him in any judicial proceeding. But, whether the court was right or wrong in holding that the relator was thus protected by the section under consideration, the decision itself would have shielded him. No court would permit the testimony of a witness, truthfully given under such circumstances, to be afterwards used against him in any judicial proceeding.

Opinions of the Court.

As already intimated, we are not called upon in this case, at the instance of this relator, to decide whether the indictment against Wallace sufficiently charges him with the offence of bribery at common law or under any statute, or whether it charges any indictable offence. That was not the relator's affair. It concerned the defendant in that indictment, but not a witness called by the commonwealth to sustain the charge laid therein. It follows from what has been said that in no view of the case was the relator unjustly restrained of his liberty; and, having been released on bail pending the hearing and consideration of this case, without having fully complied with the sentence of the court below, he must be remanded into the custody of the respondent, to the end that said sentence may be fully executed. It is accordingly

> Ordered that the relator do forthwith surrender himself into the custody of the sheriff of Lawrence county, to the end that the sentence of the Court of Quarter Sessions of said county, pronounced against him on December 17, 1890, for contempt of said court, may be fully executed; and it is further ordered that he pay the costs of this proceeding.

NO. 36 : COMMONWEALTH, EX REL. DOWNING.

OPINION, MR. JUSTICE STERRETT:

This case was argued with Commonwealth ex rel. Tate, against same defendant, No. 37 October Term 1891, in which an opinion has just been filed. The relator in this case was adjudged guilty of contempt of court, under circumstances referred to in that opinion, and what has been there said applies with equal force to him. For reasons there given, a similar order must be made in this case. It is accordingly

> Ordered that the relator do forthwith surrender himself into the custody of the sheriff of Lawrence county, to the end that the sentence of the Court of Quarter Sessions of said county, pronounced against him on December 17, 1890, for contempt of said court, may be fully executed; and it is further ordered that he pay the costs of this proceeding.

NO. 38: COMMONWEALTH, EX REL. SHAFFER.

OPINION, MR. JUSTICE STERRETT:

This case was argued with Commonwealth ex rel. Tate, against same defendant, No. 37 October Term 1891, in which an opinion has just been filed. The relator in this case was adjudged guilty of contempt of court, under circumstances referred to in that opinion, and what has been there said applies with equal force to him. For reasons there given, a similar order must be made in this case. It is accordingly

> Ordered that the relator do forthwith surrender himself into the custody of the sheriff of Lawrence county, to the end that the sentence of the Court of Quarter Sessions of said county, pronounced against him on December 17, 1890, for contempt of said court, may be fully executed; and it is further ordered that he pay the costs of this proceeding.