Schwinger Appeal.

Argued March 26, 1956. Before Rhodes, P. J., Hirt, Gunther, Wright, Woodside, Ervin, and Carr, JJ.

*Charles M. Solomon,* with him *Fox, Rothschild, O'Brien & Frankel,* for appellants.

*Francis A. Biunno,* Assistant District Attorney, with him *Christopher F. Edley* and *Lisa Aversa,* Assistant District Attorneys, *James N. Lafferty,* Deputy District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY GUNTHER, J., July 17, 1956:

Appellants, Herbert S. Schwinger and Rose Schwinger appeal from a judgment for contempt of court for refusing to answer certain questions propounded to them in the court below.

The matter in controversy arose in custody proceedings involving the custody of three children belonging to Dorothy Edwards, William Esterline and Francis Hartnett. Dorothy Edwards married William Esterline in 1948 but in 1953 he divorced her. Subsequently, in 1954, Dorothy Edwards married Francis Hartnett. Two children, James and Edna, were born of the first marriage, and the third child, Mary, although born during the Esterline marriage, was actually the child of Francis Hartnett.

On April 3, 1955, Albert D. Gershenson and wife obtained custody of Edna. Thereafter, with permission of the mother, Herbert S. Schwinger and his wife, Rose, obtained custody of Mary. The third child, James, was placed in custody of his maternal grandparents, Mr. and Mrs. James Edwards. Thereafter, the mother requested the return of Edna and Mary; the appellants

returned Mary, but the Gershensons filed a petition for a writ of habeas corpus to retain custody of Edna. A similar petition was filed by William Esterline against the mother for custody of James. The Municipal Court Supervisor of the Juvenile Division, apparently at the behest of the appellants, then filed a dependency petition against the mother to test the fitness of the mother to retain custody of Mary. Appellants were named as witnesses in this petition.

The hearing of the two habeas corpus petitions and the dependency petition were directed by the court to be heard together. On October 7, 1955, at the close of the first day of testimony, the court entered temporary orders placing James Esterline with his father, Edna with the Gershensons and Mary was committed to the Catholic Children's Bureau. After the second day's hearing, the court entered another order stating that "Mary to remain committed to Catholic Children's Bureau and transferred to Private Placement." For this hearing, appellants retained counsel and participated in the proceedings only as witnesses. However, the case in which appellants were interested having terminated, they were no longer concerned with the other phases of the case. On October 19, 1955, before the third hearing commenced, counsel for appellants asked for permission to withdraw from the proceedings stating: "Whatever their (appellants) status is . . ., I should like leave of your Honor to have them withdraw from these proceedings." The trial judge replied: "I will grant you that motion, with the understanding that they testify here before they leave."

At the previous hearing there was some testimony of money being offered by someone for the custody of the children or approval of adoption. A deputy sheriff assigned to the Municipal Court allegedly participated in changing custody of two of the children. These cir-

cumstances gave rise to a suspicion that someone may have violated the Act of 1939, June 24, P.L. 872, section 633, 18 P.S. section 4633 which provides: "Whoever deals in humanity, by trading, bartering, buying, selling, or dealing in infant children, is guilty of a felony . . ."

In accordance with the direction of the court, the Schwingers appeared and reluctantly submitted to examination by the court, the district attorney and other counsel. The trial judge stated that he wished to inquire of them as to the circumstances under which they obtained custody of the child.

Mr. Schwinger was sworn and asked his name, address, employment and a few preliminary questions which he answered. The court then inquired of him concerning his custody of Mary and, upon the advice of counsel, he refused to answer. Among the questions asked were whether he and his wife received a child; its name, how long they had the child and who delivered it to them. The witness stated he was ". . . refusing to testify, under the Constitution, the Fifth Amendment of the Constitution." He was asked if he knew certain named people. As to one he answered "no" but as to others, he refused to answer. It appears that one of the names inquired about was a woman named Emma Toczydlowski who was employed in the sheriff's office. The identification of the others does not appear from the record, but it is apparent that at least some of them were believed by the trial judge to have had something to do with the transfer of Mary's custody.

Mrs. Schwinger was called as a witness and she, too, refused to answer substantially the same question which her husband refused to answer. She, too, claimed her privilege against possible self-incrimination under the Fifth Amendment to the United States Constitution. Both appellants were held in contempt of court

and from their judgments and sentences they have filed this appeal.

The privilege against self-incrimination is deeply rooted in our history, which was brought to this continent by the early settlers. In England, under the common law, this privilege was so well established by the middle of the 17th century that it was never thought necessary to pass an act touching on the matter. It was not surprising, therefore, that the early settlers vociferously resisted all attempts by the governors of the provinces to resort to compulsory testimony for coercing confessions.[1] By reason of the common law, in Pennsylvania at least, this privilege anteceded our own Constitution. This privilege, therefore, does not stem from the Federal Constitution. It was not included in the Federal Constituton as originally adopted but was placed in the group of the ten Amendments as passed by the first Congress.

The Fifth Amendment to Federal Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." Our Supreme Court has stated that the exemption from compulsory self-incrimination is not a natural right, nor a right secured by the Federal Constitution, which a state Constitution cannot take away or abridge. *Commonwealth v. Cameron*, 229 Pa. 592, 79 A. 169. This Amendment has been held not to apply to state court proceedings: *Adamson v. California*, 332 U. S. 46, 67 S. Ct. 1672, 91 L. Ed. 1903; *Ensign v. Pennsylvania*, 227 U. S. 592, 33 S. Ct. 321, 57 L. Ed. 658; *Twining v. State of New Jersey*, 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97; *Com-*

---

[1] Wigmore on Evidence (3rd Ed.), Vol. VIII, sec. 2250 et seq.; Pittman, The Colonial and Constitutional History of The Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763; Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich. L. Rev. 1.

*monwealth v. Cameron,* supra; *Commonwealth v. Haines,* 171 Pa. Superior Ct. 362, 90 A. 2d 842. [2]

Article 1, Section 9 of the Constitution of this Commonwealth, as far as pertinent, reads: "In all criminal prosecutions the accused . . . cannot be compelled to give evidence against himself . . ." This privilege has two constitutional exceptions, however, where this privilege is abridged—with suitable safeguards: (1) any lawful investigation or judicial proceeding charging bribery or corrupt solicitation, and (2) in trials of contested elections and in proceedings for the investigation of elections. See Article III, section 32 and Article VIII, section 10.

The Act of May 23, 1887, P.L. 158, section 10, 19 P.S. section 631 provides: "Except defendants actually upon trial in a criminal court, any competent witness may be compelled to testify in any proceeding, civil or criminal; but he may not be compelled to answer any question which, in the opinion of the trial judge, would tend to criminate him . . ."

The privilege against self-incrimination is not confined to criminal cases alone. *Evans v. Metropolitan Life Ins. Co.,* 294 Pa. 406, 144 A. 294; *In re Contempt of Myers and Brei,* 83 Pa. Superior Ct. 383; *Boyd v. United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Coffey v. United States,* 116 U. S. 436, 6 S. Ct. 437, 29 L. Ed. 684. Furthermore, the privilege applies to witnesses as well as to parties. *Commonwealth v. Tracey,* 137 Pa. Superior Ct. 221, 8 A. 2d 622.

In a criminal or quasi-criminal proceeding, the defendant may not be called by the Commonwealth, as on

---

[2] While the above authorities and many more not cited firmly established this principle, the United States Supreme Court has left this question open when co-related with the Fourteenth Amendment. See *Regan v. New York,* 349 U.S. 58, 75 S. Ct. 585, 99 L. Ed. 883.

cross-examination or otherwise, in violation of his constitutional privilege. And the fact that the defendant (or a witness) had previously been sworn as a witness is of no moment, since he had not testified. It is the giving of evidence by the defendant, and not the taking of the oath, which effects a waiver of the privilege. *Commonwealth v. Rohanna,* 167 Pa. Superior Ct. 338, 74 A. 2d 807. And where an accused has claimed his constitutional privilege against self-incrimination, such testimony in compliance with the trial judge's compulsion or order results in reversible error. *Commonwealth v. Kilgallen,* 379 Pa. 315, 108 A. 2d 780.

In the instant case, the appellants were called by the court as witnesses. No infringement of constitutional right can be inferred from the appearance of a witness or from the taking of the oath. While bound to take the stand and to testify to the point where the interrogation places the witness in danger of self-incrimination, the compulsion ends there, and it is for the witness then to refuse to testify further on claim of privilege. *Commonwealth v. Cavanaugh,* 159 Pa. Superior Ct. 113, 46 A. 2d 579. Here that exact procedure was followed, but the appellants refused to testify "under the Constitution, the Fifth Amendment of the Constitution". While the Fifth Amendment is not applicable to this proceeding, and while the witness must make the claim of privilege himself,[3] he is entitled to be fully advised as to the protection of the Constitution. Even the judge ought to advise the witness of his privilege.[4] The language is not important; no specific term or expression is required in order to enable him to assert the privilege so long as it is so understood.[5]

---

[3] *Commonwealth v. House,* 6 Pa. Superior Ct. 92.

[4] *Ralph v. Brown,* 3 Watts & S. 395, 400.

[5] *Quinn v. United States,* 349 U.S. 155, 75 S. Ct. 668, 99 L. Ed. 964.

. Admittedly the witness is not, nor should he be, the sole judge in determining whether any question might tend to incriminate and destroy the privilege afforded if answered. *Commonwealth v. Bell*, 145 Pa. 374, 22 A. 641. While it is the duty of the trial judge to decide the question whether reasonable grounds exist for apprehension of danger from being compelled to answer, once the danger is made to appear, some latitude should be allowed to the witness or his counsel to judge the effect of a particular question. Each question must be viewed in the light of whether the answer *can* implicate the witness. *Manko Appeal*, 168 Pa. Superior Ct. 177, 77 A. 2d 700. In view of the fact that the privilege can be asserted by a witness only at the time when the conditions are present which make the exercise of the privilege reasonably necessary to secure the protection it affords (*Commonwealth v. Bolger*, 42 Pa. Superior Ct. 115, affirmed in 229 Pa. 597, 79 A. 113), the determination should not depend entirely upon the frame of mind of the judge. Such determination is subject to review by an appellate court. *Manko Appeal*, supra; *In re Contempt of Myers and Brei*, supra. It is not mere conjecture to state that a judge may make little or no effort to determine whether, in the question propounded, a reasonable ground exists for giving incriminating answers, particularly when the expressed attitude of the court is that "The courts cannot be hampered by the Fifth Amendment, as I see it."

The questioning here apparently had little other purpose than to ferret out possible complicity in and violations of the criminal statute. As a matter of fact, with commendable frankness, the court stated in its opinion: "We wished to question the Schwingers as to the circumstances under which they obtained custody of the child Mary. There is testimony of money being offered for the custody of the children—or at least to

obtain approval of adoption, and moreover, a deputy sheriff, who was assigned to the Municipal Court Building, participated in the changing of custody of two of these children. These suspicious circumstances, which might affect the position of all the parties in this case, should be searched to a final conclusion."

It is at once apparent that there exists a conflict between the time honored principle which normally entitles the Commonwealth to the testimony of its citizens and the equally time honored principle which grants every witness the privilege not to incriminate himself. The court is desirous of ferreting out possible criminal violations, and the witness is in the unenviable position of trying to determine how far he can answer questions without accusing himself or without committing contempt. Both must be given a reasonable interpretation. While "in preserving the privilege we must resolve not to give it more than its due significance," [6] if it appears that reasonable ground exists for the witness to apprehend danger, great latitude should be allowed in judging for himself the effect of a particular question. *Manko Appeal,* supra.

The earlier decisions of both the Supreme Court of the United States and the Supreme Court of Pennsylvania held that the danger to the witness had to be quite real and self-evident before the claim of privilege was justified. [7] The modern trend, we believe, has broadened the use of the privilege. [8] It does not neces-

---

[6] Wigmore on Evidence (3rd Ed.), Vol. VIII, sec. 2251, p. 317; *Commonwealth v. Bolger,* supra, p. 121.

[7] *Mason v. United States,* 244 U.S. 362, 37 S. Ct. 621; 61 L. Ed. 1198; *Commonwealth v. Bell,* 145 Pa. 374, 22 A. 641.

[8] *United States v. Hoffman,* 341 U.S. 479, 71 S. Ct. 814, 95 L. Ed. 1118; *United States v. Coffey,* 198 F. 2d. 438, 440; *Commonwealth v. Kilgallen,* supra; *Manko Appeal,* supra. In the *Coffey* case, the court of the Third Circuit said: ". . . Specifically, we

sarily follow that the person claiming the privilege must be guilty of a crime. *Slochower v. Board of Education, City of New York,* 350 U. S. 551, 76 S. Ct. 637, 100 L. Ed.

We have examined the record carefully and conclude that, under the circumstances of this case, the appellants appear to have been examined for the primary purpose of determining whether they committed any crime. The conviction and sentence for contempt cannot stand.

Reversed and the appellants discharged.

---

think the problem is what to do about apparently innocuous questions, the answers to which are admittedly not incriminating in themselves, when there are no additional facts before the Court which suggest particular connecting links through which the answer might lead to and might result in incrimination of the witness. We think the Supreme Court is saying that such facts are not necessary to the sustaining of the privilege. The decision in the Mason case would not be followed today. It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of linkage not seem incredible in the circumstances of the particular case . . ."