494

69 A.3d 197

Senior Judge John DRISCOLL, Senior Judge Sandra Mazer Moss, and Judge Joseph D. O'Keefe, Petitioners

v.

Thomas W. CORBETT, Jr., Governor of the Commonwealth of Pennsylvania, Carol T. Aichele, Secretary of the Commonwealth, and Zygmont A. Pines, Court Administrator of the Commonwealth of Pennsylvania, Respondents

Judge Arthur Tilson, Petitioner

v.

Thomas W. Corbett, Jr., Governor of the Commonwealth of Pennsylvania, Carol T. Aichele, Secretary of the Commonwealth of Pennsylvania, and Zygmont A. Pines, Court Administrator of the Commonwealth of Pennsylvania, Respondents.

Supreme Court of Pennsylvania.

Argued May 8, 2013.

Decided June 17, 2013.

496

Alexander Robert Bilus, Esq., David Samuel Caroline, Esq., Robert C. Heim, Esq., William T. McEnroe, Dechert, LLP, Philadelphia, for Sr. Judge John Driscoll; Sr. Judge Sandra Mazer Moss; Sr. Judge Joseph O'Keefe, Petitioners in Case No. 19 MAP 2013.

Kathleen M. Granahan, Esq., John G. Knorr III, Esq., Harrisburg, PA Office of Attorney General, John Bartley Delone, Esq., Harrisburg, for Thomas W. Corbett, Jr., Carol T. Aichele.

Patrick Schaffner Cawley, Esq., PA Office of Attorney General, Harrisburg, for Republican Caucus of the Pennsylvania House of Representatives.

Jonathan Lee Cochran, Esq., Michele D. Hangley, Esq., William T. Hangley, Esq., Hangley Aronchik Segal Pudlin & Schiller, P.C., Philadelphia, for Arthur Tilson, Petitioner in Case No. 20 MAP 2013.

A. Taylor Williams, Esq., Administrative Office of Pennsylvania Courts, for Zygmont A. Pines, Respondent in Case No. 20 MAP 2013.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## *OPINION*

Justice SAYLOR.

Challenging an express constitutional command and attendant judicial precedent, Petitioners seek to nullify the mandatory retirement provision of the Pennsylvania Constitution applicable to judicial officers.

## I.

By way of background, in 1967–68, a limited constitutional convention was convened with the approval of Pennsylvania voters. Its purpose was to consider certain proposed changes to the state charter, including changes to Article V, which pertains to the judiciary. The proposed revisions that emerged from the various committees and subcommittees were subject to public hearings and provided to the full convention for debate and amendment. They were adopted by the convention in March 1968, and ratified by the electorate of Pennsylvania on April 23, 1968.

Article V of the Pennsylvania Constitution was completely rewritten and, as such, effectively replaced Article V of the Constitution of 1874. One feature of the new Article V was a mandate that Pennsylvania jurists retire at a specific age. In particular, Section 16(b), as adopted in 1968, stated: "Justices, judges and justices of the peace shall be retired upon attaining the age of seventy years." PA. CONST. art. V, § 16(b) (1968). This language was amended in 2001 to specify that retirement must occur on December 31st of the year the jurist turns 70. *See* PA. CONST. art. V, § 16(b) (2001). After retirement, former jurists may, if they choose—and subject to necessity and approval, *see* Pa.R.J.A. 701—be assigned to serve as senior judges, *see* PA. CONST. art. V, § 16(c); 42 Pa.C.S. § 4121, for which they are compensated on a per diem basis. *See* 204 Pa.Code § 211.2(h).

Approximately twenty years after the 1967–68 constitutional convention, several judges challenged the validity of Section 16(b)'s age-based retirement mandate on federal and state constitutional grounds. The challenges, which were resolved in *Gondelman v. Commonwealth*, 520 Pa. 451, 554 A.2d 896 (1989), were unsuccessful on both grounds. Two years later, the United States Supreme Court rejected a similar challenge to a mandatory retirement provision of the Missouri Constitution, pursued under federal constitutional principles. *See Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991).

This year, several groups of Pennsylvania jurists have sought to renew the attack on Article V, Section 16(b) via multiple legal actions commenced in both federal and state courts. In the two proceedings which are the subject of this opinion, the judges lodged complaints in the Commonwealth Court, relating that they were elected, and then retained, to ten-year judicial terms, and that the named Commonwealth officials' enforcement of Section 16(b) would require them to retire against their will prior to the expiration of those terms.[1]

1. Although the original pleadings were couched as "Civil Action Complaints" and denominated the parties as plaintiffs and defendants, the Commonwealth Court appears to have treated the matters as petitions

Petitioners raised a single cause of action under the state charter, contending that: Article I protects the fundamental rights of all Pennsylvania citizens; to the extent any other part of the Pennsylvania Constitution is inconsistent with Article I, such provision is invalid; and the Commonwealth would transgress Petitioners' rights guaranteed by Article I by forcing them to retire in compliance with Article V, Section 16(b). Although their contentions are in direct conflict with *Gondelman,* Petitioners alleged that *Gondelman* "should no longer obtain" in view of: societal and demographic changes that have taken place in recent years, such as an increase in longevity and a decline in cognitive impairment among older individuals, *see* Driscoll Complaint at ¶¶ 58–62; Tilson Complaint at ¶¶ 56–62; and budgetary concerns that could be ameliorated by allowing judges to delay retirement, thereby decreasing payouts from the state's pension system, *see* Driscoll Complaint at ¶ 63; Tilson Complaint at ¶ 63. Accordingly, Petitioners sought relief in the form of a declaration that Section 16(b)'s retirement mandate is null and unenforceable, as well as a permanent injunction restraining the named Commonwealth officials from enforcing it.

Soon after they initiated the legal proceedings in the Commonwealth Court, Petitioners submitted applications for extraordinary relief to this Court, asking us to assume plenary jurisdiction over the matters. *See* 42 Pa.C.S. § 726. We granted these applications, assumed jurisdiction, and directed the parties to brief the legal issue of whether Article V, Section 16 of the Pennsylvania Constitution violates Petitioners' rights under Article I of the Pennsylvania Constitution.[2]

for review implicating its original jurisdiction. *See* Pa.R.A.P. Chapter 15. For purposes of this Opinion, we will apply the conventions employed by the Commonwealth Court. Accordingly, the self-described plaintiffs will be referred to herein as "Petitioners."

2. After Petitioners applied for extraordinary relief in this Court, but before we asserted jurisdiction, the Commonwealth defendants filed preliminary objections in the nature of a demurrer in the Commonwealth Court as to each complaint. Those demurrers have not been ruled upon.

The parties have now briefed the issue and presented oral argument.[3]

In their arguments, Petitioners first address the threshold issue of whether a constitutional amendment that was duly enacted by the people of Pennsylvania can be held invalid as contrary to the Pennsylvania Constitution's Declaration of Rights—that is, Article I of the state charter. Referencing early cases, learned treatises, and the Declaration of Independence (as well as state-level declarations from the late 18th Century), they develop that certain rights are inherent to mankind and pre-existed the organic document. Petitioners state, therefore, that Article I does not bestow these inherent rights on Pennsylvania citizens, but rather, acknowledges their existence and paramountcy and provides for their continued protection, even against a vote of the majority. Petitioners note, in this respect, that Section 1 of the Declaration of Rights is entitled "Inherent rights of mankind," and provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, § 1, *quoted in* Brief for Petitioners at 18. They additionally observe that Section 25 of the Declaration, titled "Reservation of powers in people," states:

> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government *and shall forever remain inviolate.*

PA. CONST. art. I, § 25, *quoted* in Brief for Petitioners at 18–19 (emphasis added by Petitioners). Since the rights listed in Article I are "forever … inviolate," the argument goes, a constitutional amendment that violates them is not constitutionally valid.

---

**3.** The Court Administrator has been dismissed from the actions per stipulations by the parties. The remaining defendants/appellees are represented by the Attorney General of Pennsylvania and, for convenience, will be referred to collectively as the Commonwealth.

In maintaining that Pennsylvania case law recognizes this natural-rights theory, as well as its corollary—that a duly-enacted constitutional amendment can be deemed unconstitutional—Petitioners rely heavily on *Stander v. Kelley*, 433 Pa. 406, 250 A.2d 474 (1969), a controversy in which several taxpayers challenged the validity of the 1968 version of Article V as violative of the separation of powers doctrine. Petitioners highlight that, although the specific issue addressed in *Stander* pertained to whether such a challenge was justiciable in the post-enactment timeframe, the Court reaffirmed the inherent-rights precept recognized in earlier cases by stating:

> These cases demonstrate that [c]onstitutionally ordained rights must and will be protected by the Courts against the will as well as against the vote of a majority of the people.... "One's right to life, liberty, and property ... and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.

*Id.* at 413, 250 A.2d at 478 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185–86, 87 L.Ed. 1628 (1943)) (citation and footnote omitted; emphasis removed; second ellipsis in original), *quoted* in Brief for Petitioners at 17.

Petitioners recognize that their theory in the above regards was rejected roundly in *Gondelman*. *See Gondelman*, 520 Pa. at 467, 554 A.2d at 904 (indicating that "[i]t is absurd to suggest that the rights enumerated in Article I were intended to restrain the power of the people themselves"). They contend, however, that that case was wrongly decided and should be overruled.

The second plank of Petitioners' argument is that the retirement provision in Article V, Section 16(b) violates their inherent right to equal protection of the laws, tracing the right primarily to Article I, Sections 1 and 26. *See* PA. CONST. art. I, § 26 ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise

of any civil right."). They reason that, under the equal protection precept, different types of classifications are subject to different levels of scrutiny, with suspect classifications being strictly scrutinized, "sensitive" classifications being subject to heightened or intermediate scrutiny, and other legislative classifications subject to rational-basis review. *See* Brief for Petitioners at 26 (citing *Love v. Borough of Stroudsburg*, 528 Pa. 320, 325, 597 A.2d 1137, 1139 (1991); *Small v. Horn*, 554 Pa. 600, 615, 722 A.2d 664, 672 (1998)). To determine which level of scrutiny should apply, Petitioners analyze age-based classifications under a four-pronged test recently utilized by one federal appellate court, *see Windsor v. United States*, 699 F.3d 169, 181 (2d Cir.) (classification based on sexual orientation), cert. *granted*, —— U.S. ——, 133 S.Ct. 786, 184 L.Ed.2d 527 (2012), and conclude that age is a sensitive classification under that standard, thus implicating intermediate scrutiny. This means that the legislative classification, to survive, must be substantially related to an important governmental interest. *See James v. SEPTA*, 505 Pa. 137, 147, 477 A.2d 1302, 1307 (1984).[4]

In all events, Petitioners argue that the mandatory retirement provision fails both intermediate and rational basis re-

---

4. Petitioners recognize that the lowest level of scrutiny (rational basis review) applies to age classifications under the federal Equal Protection Clause, *see Gregory*, 501 U.S. at 470–71, 111 S.Ct. at 2406, but they note that, in various contexts, the Pennsylvania Constitution may provide greater protection than its federal counterpart. In light of the importance of protecting Article I inherent rights, Petitioners urge us to "approach the determination of what level of Pennsylvania equal protection scrutiny should apply with a fresh analysis of the issue," rather than relying on the federal standard. Brief for Petitioners at 34 n.12.

Separately, Petitioners argue that we should apply intermediate scrutiny on the basis that the "right to work" is an "undeniably important" right. Brief for Petitioners at 28 (quoting *Nixon v. Commonwealth*, 576 Pa. 385, 400, 839 A.2d 277, 287 (2003)). This argument lacks precision, as Section 16(b) does not limit Petitioners' right to work as such, but rather, their right to continue as commissioned judges past the age of 70. Additionally, although Petitioners quote from the *Nixon* case, they overlook that in its context, the quoted passage undermines their position. *See Nixon*, 576 Pa. at 400, 839 A.2d at 287 ("[W]here laws restrict the other rights protected under Article I, section 1, which are undeniably important, but not fundamental, Pennsylvania courts apply a rational basis test.").

view, for three reasons: first, they aver that in the time since the constitutional amendment was passed, the incidence of cognitive decline has decreased substantially; second, they proffer that the continuance of the senior-judge system ensures there will be "sufficient judicial manpower" without the need for forced retirement at age 70, Brief for Petitioners at 36; *see infra* note 7; and third, they state that Article V, Section 18's procedures for removing incapacitated judges renders the mandatory retirement age unnecessary. In light of these factors, Petitioners allege that Article V, Section 16(b)'s mandatory retirement age merely serves to discriminate against, and stigmatize, older judges, and to provide less compensation to senior judges than to their younger counterparts. In this latter respect, according to the present allegations, senior judges' overall compensation package is inferior to that of commissioned judges because their pay depends on legislative appropriations, and they do not receive various fringe benefits available to commissioned judges. *See* Driscoll Complaint at ¶¶ 26–32; Tilson Complaint at ¶¶ 24–30.[5]

Finally, Petitioners advance a due process argument, stating that their election successes invested them with a property right to retain their judgeships for a full ten years despite their reaching the age of 70. They indicate that, as a general proposition, Article I recognizes that the right to own and enjoy property is as fundamental as the right to life and liberty, *see* PA. CONST. art. I, § 1, and that this Court has concluded that all Pennsylvania citizens have a protected

---

**5.** Senior judges presently earn $534 per day, subject to the proviso that their annual compensation, combined with their retirement income, may not exceed the compensation for a judge in active service on the court from which they retired. *See* 204 Pa.Code § 211.2(h).

Petitioners' various comments concerning remuneration to senior judges do not materially affect our analysis, below. In any event, these remarks are incomplete, as they do not recognize the interrelationship between a senior judge's pay and his or her retirement benefits. Indeed, while Petitioners otherwise recognize that federal senior judges essentially "provide volunteer services to the courts" (as they are paid the same amount either as senior judges or through retirement benefits), Brief for Petitioners at 12 (citation omitted), they fail to acknowledge that the confluence between Pennsylvania senior judge's pension benefits and pay for ongoing services offers a roughly analogous opportunity for continued public service. *See* 204 Pa.Code § 211.2(h).

interest in practicing their profession. *See Khan v. State Bd. of Auctioneer Exam'rs*, 577 Pa. 166, 183, 842 A.2d 936, 946 (2004); *Nixon*, 576 Pa. at 401, 839 A.2d at 288 ("[O]ne of the rights guaranteed under Article I, section 1 is the right to pursue a lawful occupation."). Even if the particular right to sit as a commissioned judge is not fundamental, *see Nixon*, 576 Pa. at 401, 839 A.2d at 288 ("The right to engage in a particular occupation, however, is not a fundamental right."), Petitioners reason that a "more restrictive" rational basis test is nonetheless implicated under the state charter than under the Fourteenth Amendment's Due Process Clause, *see* Brief for Petitioners at 39 (quoting *Nixon*, 576 Pa. at 401 n. 15, 839 A.2d at 287–88 n. 15). Thus, according to Petitioners, any legislation impinging upon their asserted property interest "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained." *Id.* (indirectly quoting *Adler v. Montefiore Hosp. Ass'n of W. Pa.*, 453 Pa. 60, 72, 311 A.2d 634, 640 (1973)). Here, Petitioners offer that the age restriction fails to meet that standard for the same reasons discussed above with regard to their equal protection claim. *See id.* at 40.[6]

The Commonwealth initially disputes the concept that the Declaration of Rights amounts to what it terms a "superconstitution" to which all other provisions of the state charter must conform. It emphasizes that this Court addressed the

6. In the course of their arguments, Petitioners reference anti-discrimination policies under the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (the "ADEA"), and the Pennsylvania Human Relations Act, 43 P.S. §§ 951–963 (the "PHRA"). Petitioners overlook, however, that the policies reflected in both enactments are subject to material exclusions. *See* 29 U.S.C. § 630(f) (excepting elected state officials from the definition of "employee" under the ADEA); 43 P.S. § 955 (excepting "bona fide occupational qualification[s]" from the PHRA's conception of "unlawful discriminatory practice"). *Cf. Gregory*, 501 U.S. at 467, 111 S.Ct. at 2404 (holding that the ADEA, which "excludes most important state public officials," does not apply to appointed state judges). *See generally* 46 Am.Jur. 2D *Judges* § 14. Particularly given these material omissions in Petitioners' depiction of national and state legislative policy, no further consideration of their contentions along these lines is warranted.

same argument in *Gondelman* and considered the position "absurd," since Article V, Section 16(b) arises from the same source as the Declaration of Rights: the people themselves. The Commonwealth asserts that this is particularly true inasmuch as reforming the state government is one of the rights protected by Article I:

> All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness. For the advancement of these ends *they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper.*

PA. CONST. art. I, § 2 (emphasis added). The Commonwealth views the 1968 amendments as an example of "altering" or "reforming" the government, and urges more particularly that the above provision embraces the right of the people "to determine the conditions under which those entrusted with dispensing the judicial power of the Commonwealth shall serve," limited only by the United States Constitution. Brief for Commonwealth at 13–14 (quoting *Gondelman*, 520 Pa. at 468, 554 A.2d at 904–05; *id.* at 469, 554 A.2d at 905 ("In forming the government of this Commonwealth, the only restraint upon the people is that imposed under our federal constitution.")). In this regard, the Commonwealth notes that Petitioners do not reference any decision from any jurisdiction where a court has invalidated a constitutional amendment based on a substantive inconsistency with the existing constitution. The Commonwealth therefore reasons that *Gondelman* controls this case, and there is no need to engage in a particularized equal protection or due process analysis.

Alternatively, the Commonwealth contends that the retirement provision does not violate the right to equal protection or due process under conventional measures. It states that the equal protection guarantee in the Pennsylvania Constitution is analyzed under the same standards used by the United States Supreme Court when reviewing similar claims under the Fourteenth Amendment, *see Commonwealth v. Albert*, 563 Pa. 133, 138, 758 A.2d 1149, 1151 (2000), and denies that any

"fresh analysis" (as suggested by Petitioners) is needed to determine what level of scrutiny should apply. In this respect, the Commonwealth suggests that this Court and the United States Supreme Court have established that rational basis review applies to age-based legislative classifications, *see id.* at 140, 758 A.2d at 1152; *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976), and that, under *Nixon,* individuals have no fundamental right to work in a particular occupation. *See supra* note 4. Thus, the Commonwealth contends that rational basis, and not intermediate or heightened scrutiny, is the proper standard for assessing the mandatory retirement provision.

Under that standard, the Commonwealth avers, Section 16(b) passes scrutiny, as the *Gondelman* Court determined when resolving the federal challenge. The Commonwealth recounts the explanation provided in *Gondelman* and *Malmed v. Thornburgh,* 621 F.2d 565 (3d Cir.1980), that the mandatory retirement age, together with the provision for retired jurists to participate as senior judges, rationally furthers important statewide objectives pertaining to the functioning of the judiciary as a whole, *see Gondelman,* 520 Pa. at 462, 554 A.2d at 901; *Malmed,* 621 F.2d at 575 ("The provision does not use age seventy to reach a conclusion about individual judges. It uses that age to further important system-wide objectives."), and that such goals were set forth in the Judiciary Subcommittee report and in the convention floor debates.[7] Additionally, the Commonwealth indicates that the United States Supreme Court has endorsed such objectives as legitimate and

7. Both *Gondelman* and *Malmed* recited the four-part rationale offered to the public in securing voter approval for the retirement provision, including that the retirement mandate:

> substantially increases judicial manpower when a plan for part-time post-retirement service exists. By continually bringing in younger judges while retaining the part-time services of willing and able retired judges, a system of mandatory retirement plus post-retirement service helps solve the pressing problem of court congestion and delay....

*Gondelman,* 520 Pa. at 461 n. 7, 554 A.2d at 901 n. 7; *Malmed,* 621 F.2d at 568 (both quoting Judiciary Subcommittee of the Preparatory Committee for the Pennsylvania Constitutional Convention, Reference Manual No. 5, at 203–04 (1968)).

rational in a case involving a similar provision of the Missouri Constitution, which also mandated that judges retire at age 70. *See Gregory,* 501 U.S. at 471, 111 S.Ct. at 2406–07 (listing, as justifications, a "societal demand for the highest caliber of judges in the system;" increased opportunities for qualified persons to share in the judiciary; orderly attrition through retirement; and the avoidance of "tedious and often perplexing decisions to determine which judges after a certain age are physically and mentally qualified," and stating that any one of these explanations is sufficient to rebut the claim that there is no rational relationship to a legitimate state purpose (citing and quoting *O'Neil v. Baine,* 568 S.W.2d 761, 766–67 (Mo. 1978) (*en banc*))). Thus, the Commonwealth contests Petitioners' position to the extent they argue that the ostensible objective of Section 16(b) is solely to rid the system of judges over 70 on the grounds that most of them are incapable of functioning as jurists. *See* Brief for Commonwealth at 20–21.

The Commonwealth also takes issue with any suggestion by Petitioners that the passage of time has eroded the original justification for Section 16(b), arguing that "[a] similar that-was-then-this-is-now argument" was rejected in *Gondelman.* The Commonwealth states, in this respect, that *Gondelman* deemed societal changes since 1968 to be irrelevant to the equal protection analysis on the grounds that, in order to pass the rational-basis test, the method selected by the people need not be the most effective or efficient means of achieving the governmental objective involved. *See Gondelman,* 520 Pa. at 463, 554 A.2d at 902. The Commonwealth adds that Petitioners' factual assertions in this regard are better made to the Legislature, which can initiate a remedy in the form of a new constitutional amendment. *See* Brief for Commonwealth at 22 (indirectly quoting *Reichley ex rel. Wall v. N. Penn Sch. Dist.,* 533 Pa. 519, 529, 626 A.2d 123, 129 (1993) ("The adversarial judicial system is not an appropriate forum for analyzing whether ... legislation works well or poorly.... If a statute does not work as expected, the legislature is the appropriate body to make the judgment and enact corrective legislation.")); *see also Gondelman,* 520 Pa. at 463–64, 554 A.2d at

902 ("If the selected method is not the most effective or efficient method to achieve the State objective, the people may remedy that by amending that provision.").

Responding to Petitioners' substantive due process claim, the Commonwealth relies on *Firing v. Kephart*, 466 Pa. 560, 353 A.2d 833 (1976), for the position that a judge's term expires upon his or her retirement. *See id.* at 566, 353 A.2d at 836 (concluding that Article V, taken as a whole, reveals an intent on the part of its framers that the term of a mandatorily-retired jurist expire upon his or her retirement). Therefore, the Commonwealth argues, Petitioners have no legitimate claim of entitlement to hold judicial office past the retirement date set by the Constitution, thus negating the existence of a property interest that may be subject to protection under due process norms. Insofar as Petitioners argue that they have an independent right to remain in office on the grounds that they have a protected interest in pursuing their chosen profession, the Commonwealth concludes that:

> a judgeship is not one of the "common occupations of life," . . .: it is a public office and a public trust, to be extended, if at all, on such terms as the people see fit and to be surrendered in the same way. A judge has no more right to serve beyond the time set by the Constitution than a Governor has a right to seek a third term.

Brief for the Commonwealth, at 24 (quoting *Adler*, 453 Pa. at 72, 311 A.2d at 640, and citing PA. CONST. art. IV, § 3 (pertaining to the Governor's terms of office)) (some internal quotation marks omitted).

The Republican Caucus of the Pennsylvania House of Representatives, as *amicus curiae*, adds that only the people are empowered to alter the Constitution—either by constitutional convention or by the process described in Article XI, Section 1 of the Constitution—and that no branch of government should arrogate to itself the power to do so, particularly in this case where the people have, after thoughtful deliberation, twice approved a mandatory retirement age for judges (in 1968 and 2001). *Amicus* offers, as well, that there are currently pending bills in the General Assembly pertaining to prospective

constitutional amendments addressing judicial retirement and post-judicial service, which are being considered in the light of extensive information gathered through hearings at which expert opinions and other material information has been presented. *Amicus* therefore urges this Court to deny Petitioners' request to judicially eliminate a substantive provision of the Commonwealth's organic law.

## II. Rule of Necessity and Review Standards

As a preliminary matter, we acknowledge a degree of discomfort in presiding over the present matter, as, obviously, members of this Court might benefit from a ruling favorable to Petitioners. Since, however, this potential advantage is common among commissioned Pennsylvania jurists, we proceed to discharge our constitutional duty to resolve the matter under the long-standing rule of necessity. *See, e.g., City of Philadelphia v. Fox,* 64 Pa. 169, 185 (1870) ("The true rule unquestionably is that wherever it becomes necessary for a judge to sit even where he has an interest—where no provision is made for calling another in, or where no one else can take his place—it is his duty to hear and decide, however disagreeable it may be."). That said, and as reflected below, it is our considered judgment that the judicial review must proceed with: a strong presumption that a duly implemented provision of the Pennsylvania Constitution is itself inherently "constitutional"; a large measure of deference afforded to the citizens of the Commonwealth who authorized such prescription by majority vote; and a heavy burden of persuasion imposed upon those seeking to challenge the will of the people as reflected in their state charter.[8]

8. Similar review standards apply to review of the constitutionality of statutes, in light of the allocation of legislative power to the political branch. *See, e.g., Commonwealth v. Bullock,* 590 Pa. 480, 487, 913 A.2d 207, 212 (2006). To the extent there is any difference, we believe the degree of deference afforded by reviewing courts should be greatest as applied to any assessment of the constitutionality of constitutional provisions, since such provisions are direct expressions of the people themselves.

As related below, in our judgment there are no *material* facts in dispute in this controversy, and the intra-constitutional constitutionality of Article V, Section 16(b) presents a controlling question of law, over

## III. Inherent Rights Theory

As the Commonwealth stresses, the Court in *Gondelman* indicated that nothing in Article I restrains the people of Pennsylvania from amending the Constitution as they see fit, since Article I itself recognizes that all political power "is inherent in the people" who have an "inalienable and indefeasible right to alter ... their government ... as they may think proper." PA. CONST. art. I, § 2; *see Gondelman*, 520 Pa. at 468, 554 A.2d at 904. This Court in *Stander*, however, drawing upon the language of *Barnette*, said the opposite: that a majority vote of the people of Pennsylvania cannot validly infringe upon individual constitutional rights. *See Stander*, 433 Pa. at 413, 250 A.2d at 478. Clearly, then, there is substantial tension between the pronouncements of these two cases. While *Gondelman* is the more recent of these two, this Court has most recently repeated *Stander's* assertion. *See Tharp*, 562 Pa. 231, 235–36, 754 A.2d 1251, 1253 (2000) (citing *Stander* and indicating that "the people of the Commonwealth have the authority to amend their state constitution as they deem fit, so long as they do not violate some other provision of the Pennsylvania ... constitution[ ]").

Although it is possible to construe the expressions in both *Stander* and *Tharp* as *dicta*, since no constitutional violation was found in either case, the concept that certain rights are inherent to mankind, and thus are secured rather than bestowed by the Constitution, has a long pedigree in Pennsylvania that goes back at least to the founding of the Republic. *See generally W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 512 Pa. 23, 29, 515 A.2d 1331, 1334 (1986) (noting that the drafters of the Pennsylvania Constitution of 1776 adhered to the theories of Locke, Montesquieu, "and other natural law philosophers").[9] This idea also

which our review is plenary. In the present procedural context—at the preliminary objection stage per the Commonwealth's demurrer—to the degree any facts are uncertain, we accept Petitioners' allegations concerning such facts and take these in the light most favorable to them.

9. Stated in the negative, the proposition is that the government established by the people is not the source of the individual liberties in-

comports with the more widely-prevailing political philosophy at the time the nation was founded, as evidenced by natural-law/inherent-rights passages contained in, for example, the Declaration of Independence,[10] the Virginia Declaration of Rights of 1776,[11] and the Massachusetts Declaration of Rights of 1780.[12] It was expressed, as well, in *Appeal of White*, 287 Pa. 259, 134 A. 409 (1926), where the Court, quoting from *Spann v. City of Dallas*, 111 Tex. 350, 235 S.W. 513, 515 (1921), stated:

> The right to acquire and own property, and to deal with it and use it as the owner chooses, so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty—an expression of his freedom—guaranteed as inviolate by every American Bill of Rights.

*White*, 287 Pa. at 267, 134 A. at 412.

■ Still, as the *Gondelman* decision emphasizes, one such natural right of the people is the right to alter their govern-

---

volved, and hence, the government may not remove them, either on its own initiative, or by a majority vote of the people.

**10.** "We hold these truths to be self-evident, that all men are created equal, that they are *endowed by their Creator with certain unalienable Rights*, that among these are Life, Liberty and the pursuit of Happiness.—That *to secure these rights, Governments are instituted* among Men . . . ." (Emphasis added.)

**11.** Section 1 of the Virginia Declaration, which later became part of that commonwealth's constitution, states:

All men are by nature equally free and independent, and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety.

*Hunton v. Commonwealth*, 166 Va. 229, 183 S.E. 873, 880 n. 21 (1936) (quoting VA. CONST. art. I, § 1 (1776)).

**12.** Section 1 of the 1780 Massachusetts Declaration provides:

All men are born free and equal, and have certain natural, essential, and unalienable rights, which are, the right of enjoying and defending their lives and liberties, that of acquiring, possessing, and protecting property.

*See Commonwealth v. Aves*, 35 Mass. 193, 18 Pick. 193, 1836 WL 2441 *11 (1836) (quoting MASS. CONST. art. I, § 1 (1780)).

ment as they see fit, as reflected in Section 2 of the Pennsylvania Declaration.[13] A conundrum thus arises if the people see fit to alter their government in a manner that undermines one of the other rights guaranteed by the Declaration, or, perhaps, to simply remove Article I, Section 1 in its entirety. One solution—and indeed, that advocated by Petitioners—is to view the inherent right to alter or reform government as being subject to a limiting principle, namely, that any such alteration or reformation may not be undertaken in derogation of the other natural and indefeasible civil rights.[14]

 This difficulty may be more theoretical than practical,[15] since state constitutions cannot eliminate rights otherwise available to citizens under the United States Constitution. *Cf. Commonwealth v. Edmunds*, 526 Pa. 374, 388, 586 A.2d 887, 894 (1991) (explaining that our state charter supplies a substantive "floor" of protection that must always be at least as great as that established pursuant to similar provisions in the United States Constitution). Accordingly, to the extent that there is a confluence between the rights of mankind under the Pennsylvania Constitution and rights accorded under the federal Constitution, such rights must be vindicated over and against inconsistent majoritarian acts at the state level. *Accord id.* Notably, this Court has observed such an equivalence in the equal protection arena, *see Erfer v. Com-*

13. This guarantee originally appeared in Section V of the Declaration of 1776, which provided: "That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community; And that the community hath an indubitable, unalienable and indefeasible right to reform, alter, or abolish government in such manner as shall be by that community judged most conducive to the public weal."

14. Petitioners also argue that Article I, Section 1 is of higher standing that Article I, Section 2, because Section 1 appears before Section 2. *See* Reply Brief for Petitioners at 8. Petitioners do not cite any authority for such a concept, which we do not accept.

15. In this regard, as the Commonwealth stresses, Petitioners have not referenced any decision rendered in any jurisdiction in which a constitutional amendment has been held invalid as substantively contrary to the constitution it amended.

*monwealth,* 568 Pa. 128, 139, 794 A.2d 325, 332 (2002); *Albert,* 563 Pa. at 138, 758 A.2d at 1151; *Love,* 528 Pa. at 325, 597 A.2d at 1139, but Petitioners have chosen to proceed solely under the state charter, presumably on account of the unfavorable federal precedent, *see Gregory,* 501 U.S. at 473, 111 S.Ct. at 2408.

In any event, because Petitioners advance a colorable argument—that the prospect of constitutional amendments in derogation of truly core, indefeasible rights is highly problematic—we will proceed to consider their claim that their asserted right to hold office as a commissioned jurist beyond the age of 70 is encompassed within the inherent rights of mankind. We do so because we consider this latter claim to be far less problematic to resolve.

## IV. Equal Protection

■ In advancing their equal protection claim, Petitioners initially rely on Article I, Section 1 of the state charter, which lists as inherent and indefeasible rights the enjoyment and defense of foundational freedoms—the right to life and liberty, the acquisition, possession and protection of property and reputation, and the pursuit of happiness. (This wording is substantively unchanged from the provision as it appeared in the 1776 Pennsylvania Constitution.) Their arguments accept, however, that their right to equal protection derived from this and other constitutional provisions may be qualified by the government—and no less the people—via the use of certain classifications. Thus, they proceed to advocate a heightened level of scrutiny of the age-based classification involved, and, failing this, they contend Article V, Section 16(b) does not satisfy the most liberal threshold for constitutional compliance, namely, the rational-basis test.

For the following reasons, we reject the effort to secure heightened review. First and foremost, as related above, any judicial review for constitutional compliance internal to the foundational document must be highly deferential. Here, Petitioners seek to employ heightened scrutiny to regulate the people themselves in the exercise of their "inalienable and

indefeasible" right to amend their constitution as they see fit. PA. CONST. art. I, § 2. In such circumstances, we are persuaded by the reasoning in *Gregory* disposing of a similar challenge to a state constitutional retirement mandate for Missouri judges:

> In this case, we are dealing not merely with government action, but with a state constitutional provision approved by the people of Missouri as a whole. This constitutional provision reflects both the considered judgment of the state legislature that proposed it and that of the citizens of Missouri who voted for it. We will not overturn such a law unless the varying treatment of different groups or persons is *so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the people's actions were irrational.*

*Gregory*, 501 U.S. at 471, 111 S.Ct. at 2406 (internal quotation marks, citations, and brackets omitted; emphasis added).

In view of the manifest need—which Petitioners seem reluctant to acknowledge—to balance the constitutionally-grounded right of citizens to equal protection of the laws, against the people's indefeasible right to amend their governing charter as they see fit, we would reject Petitioners' contention that the age-related basis for the classification in issue here implicates a heightened level of scrutiny, even if it were conceded that such elevated review should obtain, under the state Constitution (although it does not under the federal one, *see id.*), relative to similar age restrictions contained in an act of the General Assembly.[16]

16. We do acknowledge that there is legitimate concern with the force of some of the justifications courts have used to support the conclusion that age classifications should only implicate rational basis review. *See, e.g.*, Nina A. Kohn, *Rethinking the Constitutionality of Age Discrimination: A Challenge to a Decades–Old Consensus*, 44 U.C. DAVIS L.REV. 213, 233–35 (2010) (challenging the treatment of Americans of advanced age within a homogeneous category and suggesting that older workers have historically been disadvantaged). Indeed, the Court in *Gondelman* expressed a healthy skepticism, while still finding that Article V, Section 16(b) satisfies the rational basis test. *See Gondelman*, 520 Pa. at 459, 554 A.2d at 899–900.

516

■ In terms of conventional rational basis review, we decline to reconsider the precedent set by *Gondelman*, *see Gondelman*, 520 Pa. at 462–64, 554 A.2d at 901–02 (finding that Article V, Section 16(b) is supported by a rational basis), which is controlling absent some compelling reason to depart from that doctrine. *See, e.g., Hunt v. PSP*, 603 Pa. 156, 174, 983 A.2d 627, 637 (2009) ("[F]or purposes of stability and predictability that are essential to the rule of law, the forceful inclination of courts should favor adherence to the general rule of abiding by that which has been settled." (quoting *Shambach v. Bickhart*, 577 Pa. 384, 405–06, 845 A.2d 793, 807 (2004) (Saylor, J., concurring))). We are unable to discern any such compelling reason here.

Indeed, much of Petitioners' argumentation, at least as advanced in their brief,[17] is based on the premise that most judges are able to function as skilled jurists past the age of 70, and that changes in longevity render the age–70 retirement mandate unreasonable by current standards. In their complaints, as well, Petitioners alleged that the state pension system would benefit if the retirement mandate were to be lifted. Petitioners overlook that "[t]he wisdom of the policy behind legislative enactments is generally not the concern of the court," *Mayhugh v. Coon*, 460 Pa. 128, 136, 331 A.2d 452, 456 (1975), as we are only charged with assessing legality. *See Shelly Funeral Home, Inc. v. Warrington Twp.*, 618 Pa. 469, 476–77, 57 A.3d 1136, 1140 (2012). As to legality, we do not believe Article V, Section 16(b) "is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the people's actions were irrational." *Gregory*, 501 U.S. at 471, 111 S.Ct. at 2406 (internal quotation marks and brackets omitted). To the contrary, we agree with the Ohio Supreme Court's conclusion assessing a similar amendment to that state's constitution:

> [T]he amendment at issue ... not only provides for the retirement of judges, but for their re-appointment as well. The restriction therefore results in an increase of judicial

17. Petitioners appeared to narrow their position somewhat in their oral argument.

manpower by bringing in younger judges, while retaining the services of willing and able retired judges. It permits the orderly attrition of judges and promotes the advancement of general considerations of judicial efficiency. This insures the fitness of the judiciary as a whole and provides a judicial system of the highest caliber.

*State ex rel. Keefe v. Eyrich,* 22 Ohio St.3d 164, 489 N.E.2d 259, 264 (1986); *accord supra* note 7.

Thus, although we have no doubt that many individual judges would be capable of serving with distinction beyond their mandatory retirement date—and while the service of the present Petitioners and of many other Pennsylvania jurists reaching age 70 is honored and appreciated—there are overall systemic goals that are rationally related to valid governmental and societal interests.[18]

As for any demographic changes that have taken place since the amendment was adopted in 1968, moreover, they are irrelevant. *Accord Gondelman,* 520 Pa. at 463, 554 A.2d at 902. Petitioners cite to no authority suggesting that a constitutional amendment that was valid at its inception can become unconstitutional due to societal changes that have occurred with the passage of time. There may be some ambiguity concerning whether *legislation* that was, at the time of its enactment, rationally related to a legitimate state interest, may subsequently be stricken based on a change in underlying circumstances. *See generally Jones v. Schneiderman,* 888 F.Supp.2d 421, 425–26 (S.D.N.Y.2012) (discussing United States Supreme Court decisions). Here again, however, the fact that Article V, Section 16(b) was approved by the people pursuant to their inherent right to amend their Constitution, distinguishes this case from matters involving legislative en-

---

18. Since, again, we are addressing a duly-enacted constitutional provision, we also differ with Petitioners' argument that we must confine the rational basis review to the reasons expressed by a subcommittee providing its recommendations. In point of fact, the citizenry which approved Article V, Section 16(b) may have had a myriad of reasons for doing so; our only concern in performing the implicated deferential judicial review is that, at the time the amendment was approved, there was any rational basis for doing so.

actments. As established in *Gondelman*, Article V, Section 16(b) was valid at the time of its adoption, and hence, the proper channel for persons who believe that its underlying policies are no longer viable due to new evidence or changed circumstances is via further revision to the Constitution through an appeal to the General Assembly and the citizenry based on the factual proofs and policy arguments which they consider relevant.

As noted, in terms of equal protection, Petitioners also reference Article I, Section 26 as one source of Pennsylvania's independent equal-protection guarantee. *See* Driscoll Complaint at ¶ 68; Tilson Complaint at ¶ 67. *See generally* Russell Gerney, *Equal Protection Under the Pennsylvania Constitution*, 42 Duq. L.Rev. 455, 471–77 (2004) (discussing equal protection under Section 26). They suggest that any governmental action requiring them to retire at a certain age violates this nondiscrimination provision. *See* Brief for Petitioners at 25 n. 9.

In ascertaining the reach of Section 26, we bear in mind that the object of all constitutional interpretation is to give effect to the intent of the provision's framers, and of the people who adopted it. *See, e.g., Commonwealth ex rel. Tate v. Bell*, 145 Pa. 374, 390, 22 A. 641, 643 (1891). Significantly, neither Section 26 nor its equivalent appeared in the original Declaration of Rights in 1776. The provision first appeared as part of the Constitution of 1968.[19] This has two implications that weaken Petitioners' argument. First, the fact that Section 26 is of recent vintage makes Petitioners' position less compelling insofar as they seek to characterize the provision as enshrining rights that are "so fundamental to human beings" (as they expressed it at oral argument), that they have been recognized as pre-existing the Constitution. *See* Brief for Petitioners at 24–26 & n. 9; Reply Brief for Petitioners at

19. The voters approved Article I, Section 26 in May 1967, whereas the changes emerging from the limited Constitutional Convention, including Article V, Section 16(b), were approved in April 1968. The series of changes that began in 1966 and culminated in April 1968 are referred to collectively as the "Constitution of 1968." *See* 1 Pa.C.S. § 906(b).

8. Second, it means that the approval of Article I, Section 26 was accomplished substantially contemporaneously with that of Article V, Section 16(b), *see supra* note 19, making it unlikely that the former was intended to forbid the latter.

We note, as well, that in *Fischer v. DPW,* 509 Pa. 293, 502 A.2d 114 (1985), this Court determined that Section 26 does not define any new substantive civil rights, but clarifies that an individual may not be harassed or penalized for the exercise of his or her constitutional freedoms. *See id.* at 310–11, 502 A.2d at 123–24. Petitioners have not provided grounds to suggest that our reasoning relative to Article I, Section 1 should have any less force in the context of the anti-discrimination clause. Thus, as we have concluded that Petitioners' constitutional right to equal protection is not otherwise injured by the retirement mandate, Article I, Section 26, as construed in *Fischer,* does not provide a separate basis for relief, either independently or in combination with Article I, Section 1.

## V. Substantive Due Process

■ Petitioners' final argument is that the retirement provision violates their due process rights under the Pennsylvania Constitution. In *Adler,* this Court developed that the United States Supreme Court, in *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), included within the scope of the interests protected by the Fourteenth Amendment's Due Process Clause the right to engage in "the common occupations of life." *Adler,* 453 Pa. at 72, 311 A.2d at 640; *see Meyer,* 262 U.S. at 399, 43 S.Ct. at 626. Petitioners' central premise is that, because judging is an occupation, they have a protected property interest in continuing to sit as judges beyond the age of 70. They also aver that, although their right to sit as commissioned judges past that age may not be "fundamental," a heightened level of scrutiny—what Petitioners term a "more restrictive rational basis test than that provided for by the federal constitution," Brief for Petitioners at 39—should be employed.

■ We do not agree. In the first place, judges have no property interest conferred by their election or retention in

serving as commissioned jurists past the date set by the Constitution for their retirement. *Firing* leaves little doubt on this point, as it concluded that judges who reach the constitutional retirement age are not elected to "regular" terms—*i.e.*, six years in the case of a justice of the peace, or ten years in the case of judges and Supreme Court Justices— but instead, to terms that expire early due to the mandatory retirement provision. *See Firing*, 466 Pa. at 566–67, 353 A.2d at 836.

Petitioners distinguish *Firing* on the basis that it "did not deal with the question of whether the judge had a property interest in serving out the years to which he was elected." Reply Brief for Petitioners at 19 n. 6. In point of fact, however, *Firing* explicitly discussed the term for which judges are elected according to the precise constitutional text: judges are elected to "regular" 10–year terms, PA. CONST. art. V, § 15(a), or to lesser terms defined according to their "re-mov[al]" or "retire[ment]." *Id.* §§ 15(b), 16(b), 18(d); *see also Firing*, 466 Pa. at 566–67, 353 A.2d at 836. Since the Constitution provides for mandatory retirement at age 70, the Constitution does not itself provide for the election of any judge for any term that extends beyond the age of 70. So understood, Petitioners' observation that *Firing* did not address "the question of whether the judge had a property interest in serving out the years to which he was elected" is utterly beside the point, because no one here contests Petitioners' honored entitlement to serve out the term of office for which they are elected. Rather, this case is about Petitioners' effort to extend their term *beyond* the term for which they were elected by nullifying operative terms of the Constitution.[20]

20. Indeed, were Petitioners to succeed in their efforts to invalidate the mandatory retirement provision of the Constitution, arguably, their offices should be considered vacant as of December 31st of the year they turn 70, since the Pennsylvania voters never approved their service beyond that date. Petitioners' arguments appear to contemplate a "default" term of ten years through a retroactive invalidation of Section 16(b); however, the idea of "retrospective" election for a larger term than in fact was approved by the electorate under the salient constitutional regime is, at the very least, controversial.

█ Petitioners' due process argument also rests on the premise that they have a more general right, protected by due process norms reflected in Article I, to pursue their chosen profession. While *Nixon* indicated that the right to pursue a lawful occupation is, indeed, protected from undue infringement under Article I, Section 1, *see Nixon*, 576 Pa. at 401, 839 A.2d at 288, it also clarified that strict judicial scrutiny is only required vis-à-vis legislation that affects fundamental rights (such as the right to marry, the right to privacy, and the right to procreate), whereas rational basis review is applicable to laws that impinge upon rights that are not fundamental. *See id.* at 400, 839 A.2d at 287. Further, *Nixon* clarified that the right to pursue a particular occupation is not fundamental. *See id.* at 401, 839 A.2d at 288; *accord Murgia*, 427 U.S. at 312–13, 96 S.Ct. at 2566.[21]

Still, Petitioners appeal to a passage of *Nixon* in which this Court noted that a more restrictive version of rational basis review applies under the substantive due process rubric, than under equal protection. *See Nixon*, 576 Pa. at 400–01 & n. 15, 839 A.2d at 287–88 & n. 15 (indicating that the law "must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained"). As with their equal protection argument, however, Petitioners rely exclusively on decisions involving state or local legislation or regulations, or executive action, rather than a constitutional amendment adopted by a vote of the people pursuant to their own inherent right to determine the nature of the authority by which they are governed.

█ We recognize the dearth of decisional law involving constitutional challenges to constitutional amendments. Nevertheless, the reasoning set forth above concerning the standard for evaluating the viability of a state constitutional

**21.** Again, while Petitioners have attempted to portray *Nixon* in a light most favorable to their position, *see supra* note 4, *Nixon's* pronouncement that the right to pursue a particular occupation is not a fundamental one also undermines their threshold position that the entitlement to serve as a commissioned jurist past the age of 70 lies within the inherent rights of mankind.

amendment under the Equal Protection Clause is equally relevant where the challenger invokes review under due process norms. Under either construct, reviewing courts are the most justified in finding a classification permissible when it is enacted by the people as a constitutional amendment and does not offend the United States Constitution. Such a revision to the organic law of the Commonwealth will only be deemed to violate the constitution that it amends (if at all) where the challenger has shown—clearly, palpably, and plainly—that the amendment is so unreasonable as to be considered "irrational." *Gregory,* 501 U.S. at 471, 111 S.Ct. at 2406. Our Court in *Gondelman* determined that Article V, Section 16(b) does not fall into that category, and that determination remains binding.

Even apart from *stare decisis,* moreover, a mandated retirement age of 70 for Pennsylvania jurists implemented according to the will of the people is rational and amenable to modification according to their dictates. Petitioners, therefore, are not entitled to relief on their due process claim.

In summary, there is colorable merit to Petitioners' position that, theoretically at least, there is some possibility that a constitutional amendment might impinge on inherent, inalienable rights otherwise recognized in the Constitution itself. Nevertheless, we do not believe that the charter's framers regarded an immutable ability to continue in public service as a commissioned judge beyond seventy years of age as being within the scope of the inherent rights of mankind. Rather, in view of the people's indefeasible right to alter their government as they think proper through amending its basic charter, the mandatory retirement provision for judicial officers is subject to deferential, rational-basis review under both equal protection and due process, and it satisfies that standard. Therefore, although certain societal circumstances may have changed since 1968 when the challenged provision was added to the Constitution—and, indeed, some of the original justifications for mandatory retirement may not have reflected the most fair or even the most beneficial public policy—the proper approach of conforming the Constitution more closely with

Petitioners' vision of how experiential changes should be taken into account is to pursue further amendment to the Pennsylvania Constitution.

Accordingly, we hold that the averments in Petitioners' complaints do not state a claim on which relief may be granted, nor could any factual record be developed that would provide a basis for the remedy requested. We therefore remand these matters to the Commonwealth Court for dismissal of the complaints with prejudice and entry of judgment in favor of the Commonwealth.

Chief Justice CASTILLE and Justices EAKIN, BAER, TODD, McCAFFERY join the opinion.

Justice EAKIN files a concurring opinion in which Justices TODD and McCAFFERY join.

Justice EAKIN, concurring.

I join the majority in its entirety.

Petitioners challenge the age of mandatory withdrawal from the bench, largely contending people, even judges, do not deteriorate intellectually as rapidly they did 50 years ago. *See* Brief for Petitioners, at 35. Whether true or not, this argument is unavailing—as the majority correctly points out, a constitutional provision does not become void or voidable simply because the premise behind its enactment no longer finds the support it once did. *See* Majority Op., at 516–18, 69 A.3d at 211–12.

I write separately to suggest another, more structural justification of age limitations for judicial service, beyond the presumption of mental decay. I acknowledge such justification is not needed to resolve this challenge, but offer it only to impugn petitioners' premise that mental acuity is the sole rationale for this constitutional provision.

The Pennsylvania Constitution is designed to assure the judiciary a measure of independence not given to the other branches of government in order to insulate it from political pressure. *See generally Commonwealth, ex rel. Jiuliante v. County of Erie*, 540 Pa. 376, 657 A.2d 1245, 1247 (1995)

("Article V of the Pennsylvania Constitution bestows upon the judiciary certain inherent rights and powers to do what is reasonably necessary for the administration of justice."). For instance, terms of office are not merely two years, or four years, but an expansive ten years. Pa. Const. art. V, § 15(a). Once elected, common pleas and appellate judges do not face contested reelections or partisan opponents—they only face the electorate via a "yes or no" retention vote. Pa. Const. art. V, § 15(b); 42 Pa.C.S. § 3153(b). Furthermore, Article II, § 8 establishes a legislator's compensation may not be *increased* during a term; in contrast, Article V, § 16(a) assures a jurist's compensation will not be *decreased* during a term in retaliation for decisions made. Pa. Const. art. II, § 8; Pa. Const. art. V, § 16(a).

Jurists are thus uniquely positioned and sequestered in various ways to protect their impartiality and independence—vital bulwarks of our governmental system. However, such sequestration has a counterpoint, for too much immunity risks usurpation of power, which the tripartite structure was designed to prevent. If the power of independence is given, it is hardly imprudent to put some concrete limit on that power. A time-based limit does nothing to threaten judicial independence, but simply creates terminal points at which the power will pass to others. Thus, Article V, § 16(b) seems to me a legitimate and considered constitutional strategy to establish a temporal limit on judicial service, regardless of past or current perceptions of one's ability to perform competently beyond any given age.

Justices TODD and McCAFFERY join this concurring opinion.